(67 App. Div. 271.)

### GOODELL v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department.   December 10, 1901.)

1. ACCIDENT AT CROSSING—NEGLIGENCE—EVIDENCE.

The evidence showed that plaintiff's decedent was crossing a four-track railroad; that a freight train was approaching at a slow rate of speed; that plaintiff's decedent crossed the track on which the freight train was running, and was struck by a fast train going in the same direction with the freight train, and giving no signals of its approach.   *Held*, that the evidence was sufficient to require submission of the negligence of defendant to the jury.

2. SAME—CONTRIBUTORY NEGLIGENCE. ·

Evidence, in action for injury at crossing, *held* sufficient to take question of contributory negligence of plaintiff's decedent to the jury.

3. SAME—DUTY TO LOOK AND LISTEN.

Though a person approaching a crossing must listen as well as look, the fact that the persons injured did not look or listen for the train by which they were struck does not prevent recovery, where the physical facts proven would warrant a finding that to look or listen for that train would have been unavailing.

McLennan, J., dissenting.

Exceptions from trial term, Monroe county.

Action by James V. Goodell, as administrator of the estate of James J. Goodell, deceased, against the New York Central & Hudson River Railroad Company. From an order of nonsuit made at the close of plaintiff's evidence, he brings exceptions. Exceptions sustained, and order set aside.

The action was commenced by the administrator of James J. Goodell, deceased, intestate, to recover damages claimed to accrue to the next of kin of said decedent by reason of his death, alleged to have been caused by the negligence of the defendant. About 10:45 in the evening of January 24, 1901, the plaintiff's intestate, a young man 21 years of age, in company with his brother, Grover Goodell, and their aunt, Mrs. White, was riding in a swell-box cutter, drawn by a single horse, southerly along Glasgow street, in the village of Clyde, in the county of Wayne, when, as they were passing over the railroad tracks crossing this highway, they were struck by a fast passenger train going west, and all were instantly killed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Thomas Raines, for plaintiff.
Albert H. Harris, for defendant.

SPRING, J.   Glasgow street runs north and south in the village of Clyde. The defendant's tracks cross it at a grade, and the ground at the crossing and for some distance each way is nearly level. The four main tracks, numbering from the south, are: No. 1, the main track for east-bound passenger trains; No. 2, for like trains going west; No. 3, the west-bound freight track; and No. 4, for freight trains going east.   North of these main tracks are four switch tracks, designated in the record as Nos. 5, 6, 7, and 8.   No. 5 is immediately north of the main track for freight trains going east, and it extends several hundred feet easterly of the crossing, uniting with another switch track.   The other switch tracks are still north of No. 5.   The gauge of the defendant's track is 4 feet 8½ inches.

The space between the nearest rails of the tracks Nos. 1 and 2 is 9.48 feet; between 2 and 3, 7.28 feet; between 4 and 5, 8.48 feet. From the center of No. 5 to the center of No. 6 is 57 feet, and the like measurement from No. 6 to No. 7 is 42 feet. From the north rail of No. 8 track to the south rail of No. 1 track, which includes the entire track space, is 149 feet, and the distance from the north rail of No. 2 track to the north rail of No. 5 track is 37.4 feet. All of these measurements are along the center of Glasgow street, which is 66 feet in width. The rails of defendant's track at this crossing in the main extend above the adjacent planking, varying from 1⅜ inches down to nothing. The planking extends along parallel with each track, leaving an open space of 3 inches between each rail and the planks on each side of it. The space between the rails of each track is planked, but intervening the tracks, except for the guard plank, it is filled in with gravel. The tracks of the defendant cross the highway at a right angle, but there is a slight curve east of the street. The greater part of the village of Clyde lies north of the defendant's tracks. The Erie Canal, which is also north of the defendant's road, is also crossed by a lift bridge, the easterly end of which is 419 feet from the south rail of track No. 2. Clyde river is south of the defendant's roadbed, running along parallel with it, and distant therefrom at the crossing about 75 feet. South of the river are the tracks of the West Shore Railroad, and immediately south of them is Meadow street, which is also substantially parallel with the several tracks. Sodus street is 400 feet west of Glasgow street, and parallel with it. There are several buildings and permanent structures which tend to obscure the view of the traveler going southerly along Glasgow street toward the defendant's crossing after having passed over the lift bridge across the canal. Immediately east of Glasgow street, and contiguous to the canal, is a building called "Collier's," and close to that is Stroetzel's, which is 280 feet north of track No. 2. The prospect toward the east of one in the street is cut off by these buildings. There is a space intervening the Stroetzel Building and the Wells Marble Shop Buildings of perhaps 30 feet, from which there is an unobstructed view east, and that is also so for some feet after passing below the marble shop buildings. Between the tracks 5 and 6 the defendant's freight house is located, and the westerly end of this building is about 40 feet from the center line of the traveled part of Glasgow street, and 12.18 feet north of the north rail of track No. 5, and 51.94 feet north of the center of track No. 2. Along the entire south side of this freight house there is a platform. These permanent structures do not impede the view of an approaching train from the east for a half a mile for the entire space of 50 feet north of track No. 2. At the east side of Glasgow street, and north of the main track, is a freight and switch yard, in which are laid two tracks in addition to those already mentioned, and they do not cross Glasgow street. Between this street and Sodus street on the west, and immediately south of the main track, defendant's station is located. North of the main tracks and south of the canal are a grain house 50 feet high, a coal shed, and other

buildings, which interfere materially with the view to the west of the traveler going south in the street after passing over the canal bridge, and this difficulty was further enhanced on the night of the accident by freight cars scattered along north of these main tracks and south of the canal. The proof tends to show that only occasional glimpses of the tracks west of the crossing could be had on the night of the accident. On this night, on the east side of the crossing, there were many box freight cars in the yard east of the street and north of the main tracks. One witness, who had walked along the street that evening, testified that for a step or two after passing the marble shop buildings he could get a view of the tracks east of the crossing. There are other witnesses, however, who testified that the view east was wholly obstructed. Doherty, a witness sworn on behalf of the plaintiff, testified that he had passed over the crossing on foot a very few minutes before the accident, and in his narration of the situation said:

"I noticed there were freight cars on track 5 in front of that freight house, —either three or four, I wouldn't be positive. With reference to the highway, the one next the highway stood, I should think, about six ties from the sidewalk, or I should think ten or twelve feet. Of course, I don't know the distance of the ties apart. It was about seven ties. There was a sluiceway there, and the end of the car came up to the sluiceway. They were box cars. I observed in regard to the freight yards north of the freight house as to whether there were cars there or not. There was cars there. 1 should think there was about fifteen or sixteen. There was one car there that attracted my attention most. It belonged to the bridge builders. It was a flat car, with a house built on it. I observed as I came along whether I could see the tracks to the east looking through that freight yard that night. Q. Could you? A. I could not."

He further testified that these 15 or 20 cars in the yard "were mostly all freight cars,—box cars." The witness Meade had been over the crossing going south just before the collision, and was on the bridge over Clyde river when the freight train on track No. 3 came in sight. He was at the time driving two horses hitched to a bobsleigh, and testified:

"The rails were above the plank, and stuck to the runners of the sleigh, froze to the sleigh. 1 saw this train as it approached that crossing that night. I saw it before it approached the crossing. Q. When you passed over that lift bridge did you make any observations to the east? A. No, sir; not until I got to the yards, and when I got to the yards I seen no chance to look down the track. When I got to the yards I took an observation to the east that night; to the west, too. Those yards to the east were pretty well full of cars. There was one little place I could see through, maybe two feet, to the east, and there was some cars to the west, but a man could see the engine that stood on 4."

On the night of the collision there were three or four freight cars on track No. 5 south of the freight house. One of these cars extended west of the building, and, some witnesses testified, to within 7 or 8 feet of the east line of the sidewalk in Glasgow street. The plaintiff's engineer testified that with a box car in this location a traveler going south on the highway could not see the tracks to the east until he reached track No. 5, and in the center of that track could see a train going west on track No. 2 east of the crossing 165 feet, and from the south rail of track No. 5 to the south

rail of track No. 2 was visible for the distance of 342 feet. After that, going south, the prospect is substantially unimpeded for half a mile or more east. To summarize: As the situation was that evening, the jury might have found there was no view of the tracks east of the crossing after the open space north of the marble shop until the traveler was on track No. 5. The roadway was nearly bare of snow over the crossing, and this condition, with the rails projecting unevenly above the planking, caused the runners of a cutter or sleigh to bind and scrape so that progress was slow and difficult. The snow had been cleared off the track at the crossing, and north of track No. 5 it had been filled up on either side of the roadway 2½ feet to 3 feet high, leaving the traveled portion of the street 8 or 9 feet in width. The plaintiff's intestate, his brother, and an aunt had that forenoon gone north over the crossing to visit the plaintiff, who lived about half a mile from the railroad station. They were returning to their grandfather's, passing over the crossing a few minutes before 11 o'clock. Grover Goodell, a young man of 21, was driving, sitting between his companions upon a blanket rolled up to raise him above the other occupants. They were all familiar with the crossing, and the boys were used to handling horses, and this was especially true of Grover, who had been employed in a store in Clyde, and was accustomed to deliver goods about the village with a horse and vehicle, at night as well as by day. The night was clear, the horse old and gentle, but afraid of the locomotives and cars. As they approached the crossing from the north there was an engine on track No. 5, west of the crossing, which had a headlight, and was blowing off steam, although stationary. There was also a freight train 10 or 15 rods west of Sodus street, on track No. 4, also with a headlight. Both of these engines were facing east. There was a long freight train of over 50 cars, more than a third of a mile in length, on track No. 3, going west at the rate of 10 or 12 miles an hour. The jury might have found that this train could not have been seen by the occupants of the cutter until they were well on track No. 5, when their horse would be on track No. 4. This freight train was then east of the water tank, which was 445 feet away, and was giving the usual signals of its approach. The cutter passed along over the crossing, and was hit by a passenger train going west on track No. 2, at 60 miles an hour, and which was hid from view by the freight train, passing it at the water tank, and which gave no signal of its approach, and the noise of which was drowned by the heavier noise of the freight train. The cutter was nearly over No. 2 track when the collision occurred, and only the rear of the cutter was cut off by contact with the train. The three occupants of the cutter were thrown a considerable distance west of the crossing, where their bodies were found soon after the accident. A fast train going east went over the crossing a moment or two before the accident occurred.

The negligence of the defendant is sufficiently established to require its submission to the jury as a question of fact. Were the occupants of the cutter guilty of carelessness? The crossing was a

dangerous one under favorable circumstances. Eight tracks crossed the highway within the space of 150 feet, and the view of the main tracks east and west was impeded by permanent structures, while the yard, in which freight cars were permitted to accumulate, still further obstructed the prospect. There was a considerable space before the occupants of the cutter came to track No. 5, in which they could not see the approaching trains. Had they heard the signals from the freight train, it would have been difficult to turn in the narrow road between the snow banks. With the confusion caused by the fast train going east and the engine blowing off steam west of them, they may not have been able to note the approaching freight train. When that train came in sight they were over track No. 5, and it was apparent they could get across ahead of this train, and evidently without any danger of a collision. They could not see the rapidly approaching passenger train. It was concealed by the freight train. It gave no announcement of its coming. Even if they had miscalculated when this freight train first came within their range of vision, it would not necessarily have prevented a recovery in this action. They were in a hazardous situation confronted by several dangers. If they had attempted to turn around, they must have done so in a small space, and on a bare gravel road, with tracks above the planking, and with the possibility of catching the runners of their cutter in the open spaces between the rails and planks. The engine at their west, for aught they knew, might move down upon them. In this emergency, to drive ahead may have seemed to them the only way of escape. They expected only that they must avoid the freight train, and this they did, and would have passed over uninjured, except for the approach of the passenger train, which run down on them at a mile a minute, and without warning. We cannot say as matter of law that these people, in this perilous situation, failed to exercise the care and caution which a person of ordinary intelligence was called upon to observe. See Wynn v. Railroad Co., 133 N Y. 575, 30 N. E. 721; Benoit v. Railroad Co., 154 N. Y. 223–228, 48 N. E. 524; Waldele v. Railroad Co., 4 App. Div. 549, 38 N. Y. Supp. 1009.

When they had crossed on track No. 5 they were not negligent as a matter of law in going ahead of the freight train, and that is the train by which their conduct is to be measured. A glance at the surroundings may have convinced them it was feasible to cross before that train could reach them, and that was the only way out of the dilemma. In that forecast of a difficult situation they made no error. It is claimed they should have listened. That would not have apprised them of the oncoming of the passenger train, for the noise of its approach could not be distinguished above the din of the freight train. The bell on the express train was not ringing, so to listen then would have been fruitless. They could see the freight train, and knew they could avoid it. If they had listended they would not have been aware that the other train was coming.

It is, however, urged that the occupants of the cutter must have seen the approaching express train before they reached No. 2 track;

and in time to stop and avoid the collision. As has been already stated, the engineer testified that with the freight car seven feet east of the easterly line of the sidewalk on Glasgow street a person on the southerly rail of track No. 5 could see easterly on track No. 2 342 feet. At that point, therefore, neither the passenger train nor the freight train was visible, as the water tank where the passenger train passed the engine of the freight was 445 feet distant. After passing over track No. 5, the freight train was then in sight. If upon that instant the plaintiff's intestate had discovered the coming passenger train we may not hold as matter of law he was imputable with negligence for failure to stop. The horse would then be well over track No. 4. We may assume his horse was restive, and his effort to rein him off or veer him off may have been too perilous to be practicable. We must also take into account, in measuring up the character of responsibility of plaintiff's intestate, the engine on track No. 5, which was blowing off steam, and the freight train on No. 4, both of which were west of the crossing. It may be also the occupants of the cutter did not observe the approaching express train on the very instant it might have been seen. Their attention may have been distracted somewhat by the apparent dangers from the trains at their right and by the restiveness of their horse.

Again, a jury might have found that the express train was not in sight until the cutter was nearly or quite upon track No. 4. The cutter, with its load, on bare ground, was necessarily delayed in its progress, and the rate of speed of the fast train may have been 20 times that of the horse and cutter. The northerly rail of track No. 4 was about 30 feet distant from the southerly rail of track No. 2, so that the train must have been 600 feet away when the cutter reached track No. 4, and was still concealed from the people in the cutter by the freight train. In considering the conduct of the plaintiff's intestate and his companions in the cutter, we are not to test them wholly by the light which the record sheds, but in a measure from the standpoint of these people, with the dangers which apparently were confronting them. In the emergency thus created we may not say that it was not for a jury to determine whether the plaintiff's intestate performed the duty required of him in passing over the crossing.

Considerable comment is made by the defendant's counsel because there were no eyewitnesses of the accident. The facts, however, were ample to submit to a jury. That the plaintiff's intestate with his brother and an aunt, started that evening from the home of the plaintiff, in a cutter as described, is proved by the latter. The train going east certainly did not strike them. The fireman of the freight train testified that train did not come in contact with them, and, in fact, the distance they were hurled indicates they were not hit by a slow-moving train. Their bodies were found west of the crossing, directly after the west-bound passenger train passed over it. The horse, with the cutter, was found a short distance south of the crossing, and the end of the cutter was cleft off, as if by an object in rapid motion. The train stopped after the collision by

the electric tower signal at Sodus street, although Clyde station was not a stopping place for this train. These are facts, with others, from which a jury might have found a collision with this train. The other facts from which their conduct and their course over the crossing can be inferred have already been adverted to.

It has been held that, when there are no eyewitnesses of a collision of this kind, the rule requiring strict proof of the vigilance of the person killed or injured is somewhat relaxed. Pruey v. Railroad Co., 41 App. Div. 158, 58 N. Y. Supp. 797, affirmed 166 N. Y. 616, 59 N. E. 1129; Noble v. Railroad Co., 20 App. Div. 40, 46 N. Y. Supp. 645, affirmed 161 N. Y. 620, 55 N. E. 1098. In the latter case the court say at page 42, 20 App. Div., and page 647, 46 N. Y. Supp.:

"In actions to recover damages for negligence resulting in death, where there are no eyewitnesses of the accident, the freedom of the deceased from contributory negligence may be established by proof of the facts and circumstances from which it may fairly be inferred that the deceased was not in fault."

We find nothing in Wieland v. Canal Co., 167 N. Y. 19, 60 N. E. 234, which lessens the effect of these cases. In fact, in its opinion the court is careful to uphold the doctrine which they enunciate, but disposed of the contention before it on its own peculiar facts. In that case the decedent, a person of mature years, in full possession of his faculties, was killed by a train at a crossing with which he was entirely familiar. The conformation of the land adjacent to the crossing made it hazardous, and yet there was an unimpeded view of an approaching train before the crossing was reached. The alleged caution of the decedent was based upon inferences deducible from these fixed physical features. In the present case the great hazard was due mainly to temporary conditions, which are elucidated by the proof, so that the jury could appreciate quite clearly how the collision occurred, and what obstacles confronted the plaintiff's intestate and his companions as they approached the track on which they were struck.

The counsel for the defendant is undoubtedly correct in his assertion of the rule that a person approaching a crossing must listen as well as look, and especially is this true if for any reason his sense of sight will not avail him. It is quite obvious, if the situation existed as described by the witnesses, that the decedent could have heard nothing, however intently he may have listened. With that fact established, it was not incumbent upon him to exercise this faculty. In discussing this principle the court in Smedis v. Railroad Co., 88 N. Y. 13, use this language at page 19, 88 N. Y.:

"But it is urged that, inasmuch as no witness testifies that the intestate looked to see or listened to hear if the defendant's train was approaching, it must be assumed that he did not, and that such omission was negligence on his part. We know of no such rule. While it is true that a traveler on approaching a railroad crossing is bound to look and listen for an approaching train, before undertaking to cross, it is only where it appears from the evidence that he might have seen had he looked, or might have heard had he listened, that a jury is authorized to find that he did not look, and did not listen."

In this case the jury may not be permitted to find that the occupants of the cutter did look or listen for the approaching passenger train, but the physical facts proven would warrant the jury in finding that to look or listen for that train would have been unavailing. This distinction is well illustrated in the very recent decision in Fejdowski v. Canal Co., 168 N. Y. 500, 61 N. E. 888, where the court, after approving the excerpt above quoted, and the Pruey Case cited above, adds, in speaking· of the plaintiff's intestate, at page 506: "He is not required to look. or listen when neither· would do any good, and such, as the jury might have found, was the situation when the decedent met his death."

Grover Goodell, the driver, must have known that a train approaching a crossing was accustomed to give signals, and the fact he heard only those on the freight engine may have been an element entering into his determination to go over ahead of that train. Certainly, had he known of the approach of the fast train which collided with the cutter, it is fair to infer he would not have been so foolhardy as to race with it.

We are satisfied, after a careful consideration of the record, that the case should have been submitted to the jury. The plaintiff's exceptions should be sustained, the nonsuit set aside, and a new trial ordered, with costs to the plaintiff to abide the event.

The plaintiff's exceptions are sustained, the nonsuit set aside, and a new trial ordered, with costs to the plaintiff to abide the event. All concur, except McLENNAN, J., who dissents in opinion.

McLENNAN, J. (dissenting). The only question which need be considered upon this appeal is, was there any evidence which tended to prove that plaintiff's intestate was free from contributory negligence? The facts bearing upon this issue are few and simple: The deceased was familiar with the highway leading across the defendant's tracks where the accident occurred. He knew the location of every permanent structure upon either side which could prevent a traveler upon the highway from seeing an approaching train. He was also familiar, in a general way at least, with the manner in which the defendant's trains were operated at the place in question. He knew the location of the switch tracks, and of all the railroad appliances located north of defendant's freight depot, and of track No. 5, which is the first track south of the freight depot. On the night in question he knew, if he looked, precisely how such 'tracks were occupied, and what engines and cars were upon them. As the deceased proceeded along the highway to track No. 5 he knew, if he listened, that a train was approaching from the east, because its bell was rung continuously, and the whistle was sounded at the whistling post. Indeed, it is not claimed that the defendant was in any manner negligent in the operation of that train. After the deceased crossed track No. 5, which is located just south of the freight depot, and on which a train of cars without an engine was standing, if he looked he saw the freight train, the bell of which was ringing, and the whistle of which had sounded, approaching the highway from the east, on track No. 3, and that it was approaching

at the rate of 10 or 12 miles an hour. When at this point, and just as he crossed track No. 5, the deceased also knew, if he looked, that a passenger train was approaching from the east on track No 2, because the evidence clearly establishes that from that point such passenger train was in full view. So far as is disclosed by the evidence, the deceased, without giving any attention to the other tracks, —without making any observation to ascertain whether or not a train was approaching on track No. 2, which is next south of track No. 3, upon which the freight train was approaching,—drove on in advance of the freight train, and attempted to pass in front of the passenger train, when he was struck, and the accident resulted. When the deceased was at the point on the highway just south of track No. 5 he saw and heard, or could have seen and heard, the freight train approaching on track No. 3, and had an unobstructed view of the approaching passenger train. Apparently he then made up his mind that he could cross in advance of the freight train, and drove on without looking or listening, or taking any precautions to ascertain whether or not there were any other trains approaching on tracks Nos. 1 and 2, or to guard against a collision with such trains. At all events, there is no proof that the deceased exercised any care whatever. Under those circumstances, I think the deceased was chargeable with contributory negligence as matter of law. In Heaney v. Railroad Co., 112 N. Y. 122, 19 N. E. 422, the deceased started to cross the defendant's tracks about 6 o'clock in the morning. The morning was cloudy and rainy. A train had just passed on the south track, which was nearest to the deceased, and the smoke from its engine settled down upon the road behind it sufficiently to temporarily obscure objects in the line of vision. The deceased, however, went ahead without looking to ascertain whether or not a train was approaching on the other track, and as he stepped upon the north track he was struck by a west-bound train and killed. It was held that the deceased was guilty of contributory negligence as matter of law. In Daniels v. Rapid Transit Co., 125 N. Y. 407, 26 N. E. 466, the deceased was familiar with the locality, and knew that there were two railroad tracks upon which trains passed in opposite directions. A train was passing on the south track. After it passed the deceased crossed the south track, and, when he had done so, if he had looked he could have seen a train approaching on the north track. He, however, proceeded to cross the north track without looking, and was struck and killed. It was held that the deceased was guilty of contributory negligence as matter of law, and that no recovery could be had. Many cases might be cited in support of the proposition that a traveler who, in attempting to cross a double-track railroad, crosses in front of a train approaching on the track next to him, or behind such train after it has passed, and then proceeds to cross the other track without looking and listening to ascertain whether or not it is safe to do so, and sustains injury, is guilty of contributory negligence which will prevent a recovery for the injuries sustained, where it does not appear that he could not have seen or heard the train with which he came in collision if he had taken such precautions.

But it is suggested that in the case at bar, when the deceased was on track No. 5, or when he had crossed such track, and saw, or could have seen, the approaching freight train, and also the passenger train which struck him, he was in a place of danger; that it would then have been unsafe for him to stop; that he could not have turned back, and therefore was justified in attempting to cross ahead of the two approaching trains; and that under such circumstances proof of the exercise of care and prudence on the part of the deceased may be dispensed with. In the first place, there is no evidence that the deceased considered the place between tracks Nos. 5 and 4 dangerous. As matter of fact, no engine or car upon those tracks, or upon the tracks north of the freight house, were moving, or did move, until after the accident. There is no evidence tending to show that the deceased tried to stop or turn around before attempting to cross in front of the approaching trains, or that he did any other act or thing except to go forward in advance of one train, and directly in front of the other, with which he collided. If the place between tracks Nos. 5 and 4 was a dangerous place, that fact was known to the deceased. He knew that until he reached that point he could not see a train approaching from the east, and he knew a train was approaching; for he heard, or ought to have heard, its bell and whistle. A traveler upon a highway may not proceed to a place of danger or a railroad crossing, and then say: "I am now in a dangerous place, and so am entitled to race with an approaching train in an attempt to cross ahead of it." We think it is not the law that a traveler upon a highway who is attempting to cross the tracks of a railroad may voluntarily put himself in a dangerous situation, and then be relieved from the necessity of taking any precautions to avoid collision with a train passing such crossing. .

In the case at bar there is not a particle of evidence to indicate that the deceased did a single thing—exercised the slightest care—after reaching track No. 5, or at any other time, to avoid the accident. The whole evidence bearing upon that branch of the case may be summed up by saying: The deceased and his two companions were in a cutter drawn by a horse which sometimes was afraid of engines. He started to drive upon the highway in question across the tracks of defendant's railroad. Before he reached track No. 5 he heard the bell ringing on a train approaching the highway from the east, and heard the sound of the whistle. He proceeded to a point between tracks Nos. 4 and 5, and then, if he looked, he saw the freight train approaching which had rung the bell and sounded the whistle. He also saw, if he looked, because it was in full view, the approaching passenger train. He drove on, crossed in safety track No. 3, on which the freight train was approaching, attempted to cross track No. 2, on which the passenger train was approaching, was struck, and he and his two companions were killed. No one saw the accident. No witness attempts to say what the deceased did or did not do. It simply appears that at a certain point upon the highway in question he started to drive south; that when he reached track No. 2 he was struck by a passenger train coming from the east, and was killed.

Before a recovery can be had by a traveler upon a highway, for injuries sustained by coming in collision with a railroad train crossing such highway, it must be shown, either by direct evidence or by circumstances, that such traveler exercised a reasonable degree of care, considering all the circumstances, to avoid such collision. Speculation, pure and simple, will not meet the requirements. In the case of Bond v. Smith, 113 N. Y. 378, 21 N. E. 128, which was an action of negligence, Judge Earl, in writing the opinion for the court, said:

"We have no right to guess that he [the deceased] was free from fault; it was incumbent upon the plaintiff to show it by a preponderance of evidence. She furnished the jury with nothing from which they could infer the freedom of the intestate from fault. She simply furnished them food for speculation, and that will not do for the basis of a verdict. The law demands proof, and not mere surmises."

In the case of Fejdowski v. Canal Co., 168 N. Y. 500, 61 N. E. 888, the headnote is as follows:

"Where there is no evidence, express or circumstantial, that plaintiff's intestate either looked or listened before he attempted to cross a railroad track, an instruction that the jury might take all the circumstances into consideration, and determine whether or not he did look and listen, and whether or not he could have seen or heard the approaching engine had he done so, is erroneous, since a verdict in favor of plaintiff may have been based upon the assumption that he did look and listen, and a judgment entered thereon must be reversed."

It is quite as reasonable to suppose that the deceased attempted to cross in front of the passenger train which struck him, because he thought he could do so before it reached the crossing, but failed for the reason that he miscalculated the distance or the rate of speed, as that he made the attempt because he considered it was dangerous to stop and remain where he was or to attempt to turn around. One surmise is quite as reasonable as the other. There is no evidence which tends to support one theory as against the other.

It is suggested in the prevailing opinion that when the deceased started to cross track No. 3 he concluded and had a right to conclude that he could cross in advance of the freight train; that his view of the passenger train was then obstructed by the freight train; and as the bell was not being rung on the passenger train, and no warning given of its approach, he had a right to assume no train was approaching on track No. 2, and therefore was not under the necessity of looking or listening or of taking any other precaution for his safety.

In the first place, there is not a particle of proof to indicate that the deceased could not have seen or heard, or that he did not see or hear, the approaching passenger train before he entered upon track No. 3, or that the freight train on that track in any manner interfered with his view of the passenger train at that time. Indeed, an inspection of the maps put in evidence clearly demonstrates that he could have seen such train if he had looked. But, even if the freight train obstructed the view of the passenger train, I understand the duty still rested upon the deceased to make some in-

vestigation to ascertain whether or not it was safe to cross the track in front of the passenger train; that even under such circumstances he was called upon to exercise such care and caution as, under all the circumstances, was reasonable; and that in an action brought to recover for the death of the deceased it is essential that proof should be made that such degree of care and caution had been exercised by the deceased. He must look and listen, even under such circumstances, unless proof is made that it would have been "utterly useless" to have done so.

We think the case of Wieland v. Canal Co., 167 N. Y. 19, 60 N. E. 234, recently decided by the court of appeals, is decisive of the question under consideration. That was a railroad crossing case, and the train which struck the deceased was going at the rate of 50 or 60 miles an hour, giving no warning of its approach. At a point on the highway 30 feet north of the railroad track a better view could be obtained of the track than at any other point, but from that point it was only visible for a distance of from 150 to 200 feet, and the situation was such that an approaching train could not be heard until it came within 150 or 200 feet of the crossing. After leaving the point in the highway 30 feet distant from the crossing, the view of the railroad track was considerably shortened until the crossing was reached. Under those circumstances, the plaintiff's intestate in that case attempted to cross, and was struck and killed by the approaching train. In discussing the question of the contributory negligence of the deceased, the court said:

"He [the deceased] was bound to exercise reasonable care for his self-preservation; that is, he was bound to exercise that degree of care which a reasonably prudent man would use. * * * He was required to look and listen. Nothing could excuse the absence of this degree of care, or justify the lack of evidence tending to show that it was exercised, except proof that under the conditions which existed it would have been unavailing. Did the decedent either look or listen before he went upon the railroad track? We can find no answer to this question in the record. As we have stated, there is not a single fact or circumstance in the evidence which sheds any light upon the decedent's movements between the time when he was seen a quarter of a mile north of the railroad track and the instant when he met his death. Could he have heard if he had listened, or could he have seen if he had looked? The evidence shows affirmatively that neither of these safeguards would have been unavailing. Upon the facts before us it must be assumed that the situation was one in which it was difficult either to hear or to see in time to avoid danger, but it was possible to see and hear, and therefore it was the duty of the decedent to use his faculties of sight and hearing in the exercise of such reasonable care as the known danger of the place required. Had the evidence shown, or tended to show, that either or both of these precautions would have been utterly useless, that branch of the case would have been properly submitted to the jury upon the question whether the decedent had exercised such reasonable care as the exigencies of the situation rendered possible. But when it was once shown that the conditions were such that the decedent, by the exercise of his faculties of sight and hearing, might have averted the disaster, it became necessary for the plaintiff to go a step further, and give some affirmative evidence from which a jury could have found that the decedent was free from contributory negligence. She has failed in this particular. There is neither direct nor circumstantial evidence which points either to the presence or absence of contributory negligence on the part of the decedent, and the case, therefore, falls within the rule very tersely expressed in Wiwirowski v. Railway Co., 124 N. Y. 420, 26 N. E. 1023, and Cordell v. Railroad Co., 75 N. Y. 330, as follows: 'When the circumstan-

ces point as much to the negligence of the deceased as to its absence, or point in neither direction, a refusal to nonsuit is error.' "

In the case at bar, while we may surmise and speculate, it cannot be said—and there is no evidence tending to support the statement—that it would have been "utterly useless" for the deceased to have looked and listened, and therefore, under the latest decision of the court of appeals upon that question, it was essential, in order to entitle the plaintiff to recover, that proof be made that the deceased did look and listen before attempting to cross the track, where he met his death. A traveler upon a highway, seeking to cross a railroad track, who is placed in a dangerous situation immediately before attempting to cross, is not thereby relieved from the duty of exercising ordinary care and prudence, but he must exercise "such reasonable care as the exigencies of the situation rendered possible." In the record before us there is no evidence that such care, or any care, was exercised by the deceased. Such traveler is bound to "look and listen," and it must be proved, not surmised, that he did so, or else it must be proved, not surmised, that to look and listen would have been "utterly useless." In this case no such proof was made.

If the rule of law applicable to this case is correctly stated in the prevailing opinion, the fact that a person was killed at a railroad crossing when there were no eyewitnesses to the accident may be of great advantage to a plaintiff in an action, brought to recover damages for such death, because in such case it will only be necessary to prove that the decedent was in a place of peril immediately before the accident occurred,—a place where it was difficult to see or hear an approaching train,—and from that fact alone it will be competent for a jury to find that he was free from contributory negligence. We think the court of appeals in the case last cited holds distinctly that, even under those circumstances, it must be proved that the deceased looked and listened, or else that those precautions would have been utterly unavailing to prevent the accident. There is no such proof in the case at bar. The conclusion of the whole matter is that there was no evidence tending to establish freedom from contributory negligence on the part of plaintiff's intestate.

It follows that the nonsuit was right, that plaintiff's exceptions should be overruled, and judgment entered upon the nonsuit in favor of the defendant, with costs.